1
2
3
4
5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

6

ROBERT D. LEDOUX, JR.,

7                                   Plaintiff,

8          v.

9  MICHAEL J. ASTRUE, Commissioner of
   Social Security,
10
11                                   Defendant.

Case No. 3:10-cv-05858-KLS

ORDER REVERSING DEFENDANT'S
DECISION TO DENY BENEFITS AND
REMANDING FOR FURTHER
ADMINISTRATIVE PROCEEDINGS

12
13
14
15
16          Plaintiff has brought this matter for judicial review of defendant's denial of his

17  applications for disability insurance and supplemental security income ("SSI") benefits.

18  Pursuant to 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73 and Local Rule MJR 13, the

19  parties have consented to have this matter heard by the undersigned Magistrate Judge.  After

20  reviewing the parties' briefs and the remaining record, the Court hereby finds that for the reasons

21  set forth below, defendant's decision to deny benefits should be reversed and this matter should

22  be remanded for further administrative proceedings.

23
24                      FACTUAL AND PROCEDURAL HISTORY

25          On March 10, 2003, plaintiff filed an application for SSI benefits and on March 19, 2003,

26  he filed another application for disability insurance benefits, alleging disability as of March 10,

ORDER - 1

2003, due to back pain/degenerative disc disease. See Administrative Record ("AR") 19, 52, 58, 84, 475. His applications were denied upon initial administrative review and on reconsideration. See AR 19, 33, 475. A hearing was held before an administrative law judge ("ALJ") on June 22, 2004, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. See AR 398-424.

On October 21, 2004, the ALJ issued a decision determining plaintiff to be not disabled. See AR 145-51. The Appeals Council granted plaintiff's request for review of that decision on April 29, 2005, remanding the matter for further administrative proceedings. See AR 152-55. A second hearing was held before a different ALJ on January 12, 2007, at which plaintiff, represented by counsel, again appeared and testified, as did two medical experts and a different vocational expert. See AR 425-60. On April 10, 2007, that ALJ issued a decision, in which he too found plaintiff to be disabled. See AR 19-28. Plaintiff's request for review of the second ALJ's decision was denied by the Appeals Council on February 25, 2008, making that decision defendant's final decision. See AR 7; 20 C.F.R. § 404.981, § 416.1481.

On April 8, 2008, plaintiff filed a complaint in this Court seeking judicial review of defendant's final decision. See LeDoux v. Astrue, 3:08-cv-05218-KLS, ECF #1. On January 6, 2009, the Court issued an order, in which it found defendant erred in determining plaintiff to be not disabled. See AR 525-46. Specifically, the Court reversed defendant's decision on the basis that the ALJ erred: (1) in failing to properly consider the mental functional limitations assessed by David B. Rosengren, Ph.D.; (2) in rejecting the environmental restrictions testified to by medical expert, Dr. Kenneth Asher; (3) in rejecting the lay witness statements provided by Nozomi Kitagawa, plaintiff's ex-wife, and Susan D. Woodke, M.A., a vocational rehabilitation counselor; and (4) for the above reasons, in finding plaintiff to be capable of performing other

ORDER - 2

jobs existing in significant numbers in the national economy. See id.

On February 26, 2009, pursuant to this Court's order, the Appeals Council vacated the second ALJ's decision. See AR 547, 549. A third hearing was held on January 4, 2010, before yet another ALJ, at which plaintiff, represented by counsel, appeared and testified, as did a third different vocational expert. See AR 669-88. On February 12, 2010, that ALJ issued a decision, in which once more plaintiff was found to be not disabled. See AR 475-93. On September 24, 2010, the Appeals Council declined to assume jurisdiction of the case. See AR 461. The third ALJ's decision thus became defendant's final decision after 60 days. See 20 C.F.R. § 404.984, § 416.1484. On November 19, 2010, plaintiff filed a complaint in this Court seeking judicial review of the ALJ's decision. See ECF #1. The administrative record was filed with the Court on February 2, 2011. See ECF #9. The parties have completed their briefing, and therefore this matter is now ripe for judicial review and a decision by the Court.

Plaintiff argues the third ALJ's decision should be reversed and remanded to defendant for an award of benefits or, in the alternative, for further administrative proceedings, because the ALJ erred: (1) in evaluating the medical evidence in the record; (2) in assessing plaintiff's credibility; (3) in evaluating the lay witness evidence in the record; (4) in assessing plaintiff's residual functional capacity; and (5) in finding him to be capable of performing other jobs existing in significant numbers in the national economy. The Court agrees the third ALJ erred as well in determining plaintiff to be not disabled, but once more, for the reasons set forth below, finds that although defendant's decision should be reversed, this matter should be remanded for further administrative proceedings.

DISCUSSION

This Court must uphold defendant's determination that plaintiff is not disabled if the

ORDER - 3

proper legal standards were applied and there is substantial evidence in the record as a whole to support the determination. See Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. See Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold defendant's decision. See Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.      The ALJ's Evaluation of the Medical Evidence in the Record

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. See Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Sec. Admin., 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725. The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id. The ALJ also may draw inferences

ORDER - 4

"logically flowing from the evidence." <u>Sample</u>, 694 F.2d at 642. Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." <u>Magallanes v. Bowen</u>, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1996). Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." <u>Id.</u> at 830-31. However, the ALJ "need not discuss *all* evidence presented" to him or her. <u>Vincent on Behalf of Vincent v. Heckler</u>, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original). The ALJ must only explain why "significant probative evidence has been rejected." <u>Id.</u>; <u>see also</u> <u>Cotter v. Harris</u>, 642 F.2d 700, 706-07 (3rd Cir. 1981); <u>Garfield v. Schweiker</u>, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. <u>See</u> <u>Lester</u>, 81 F.3d at 830. On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." <u>Batson v. Commissioner of Social Sec. Admin.</u>, 359 F.3d 1190, 1195 (9th Cir. 2004); <u>see</u> <u>also</u> <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830-31. A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." <u>Id.</u> at 830-31; <u>Tonapetyan</u>, 242 F.3d at 1149.

A. Dr. Rosengren

Unlike the second ALJ, the third ALJ did address the evaluation report of Dr. Rosengren, finding specifically that:

> . . . In July 2006, [the] claimant underwent an additional psychological evaluation by David B. Rosengren, Ph.D. Ex. 19F. Dr. Rosengren's IQ testing scores were again in the low-average range with mathematics in the low-average to borderline range. A history of ADHD also was factored into this evaluation. Dr. Rosengren assessed [the] claimant with the diagnoses of attention deficit disorder, combined type, generalized anxiety disorder, rule out post traumatic stress disorder [("PTSD")], reading disorder (provisional), mathematics disorder (provisional), pain disorder associated with both psychological factors and a general medical condition, with a GAF [global assessment of functioning] score of 50. Ex. 19F/7. Dr. Rosengren opined that [the] claimant's mental impairments would: affect his work speed, accuracy, productivity, and quality over the course of a work shift; cause impulsivity that would place him at risk for poor judgment and injury/harm; cause him to experience a variety of problems in self-direction, including planning and executing activities, following instructions, concentrating on completing tasks, and impulsivity and distraction by external/environmental stimuli. He also assessed [the] claimant [sic] may need adjustments in his break schedule to accommodate his fluctuating attention and would need accommodations for learning new work skills, including specialized instructions. Dr. Rosengren noted that [the] claimant's overall cognitive scores and other test results suggested he would work better without a need to solve complex problems and would be most at ease working independently rather than with others (Exhibit 19F, p. 10). Significantly, Dr. Rosengren concluded that adequate treatment of the ADHS [sic] and anxiety will likely improve his function significantly. Ex. 19F/10. An additional consideration would be to break-up his work day amongst tasks, but to do these sequentially; multitasking will be a challenge for [the] claimant. Ex. 19F/10. The undersigned accords significant weight to Dr. Rosengren's opinion. In light of Dr. Rosengren's opinion, the claimant has the mental residual functional capacity to avoid exposure to hazards such as unprotected heights and moving machinery, he is able to understand, remember and carry out short simple instructions and perform repetitive tasks; should have no interaction with the general public, and occasional superficial interaction with coworkers and supervisors for work-related purposes.

AR 487 (internal footnote omitted).

Plaintiff argues the ALJ failed to properly account for all of the functional limitations Dr. Rosengren found. Specifically, plaintiff asserts the ALJ should have found he should have only

"limited" as opposed to "occasional" contact with co-workers. But plaintiff points to nothing in Dr. Rosengren's opinion that the former term would be a more accurate description of his ability in this area than the latter, or even that there is a difference between the two. The ALJ, therefore, did not err in this regard. On the other hand, the Court agrees with plaintiff that the limitation to understanding, remembering and carrying out short simple instructions and performing repetitive tasks does not necessarily take into account all of the mental limitations Dr. Rosengren assessed, such as the issues plaintiff had with speed, accuracy and productivity, which the Court had noted in its previous order.[1] See AR 356, 533.

B.    Dr. Asher

With respect to the medical expert testimony from Dr. Asher, the ALJ found as follows:

> At the second hearing, medical expert Dr. Asher testified that the record supported finding [the] claimant had an attention deficit disorder/cognitive problems, including an attention deficit disorder and various learning problems, a somatoform disorder – probably most likely a pain disorder, and an anxiety disorder which had been diagnosed as a generalized anxiety disorder. Ex. 16E/24-25. He specifically cited to the examinations conducted by Ed Cotgageorge, Ph.D., (Ex. 17F) and David B. Rosengren, Ph.D., Licensed Psychologist (Ex. 19F), when he concluded that the majority of testing results were consistent with attention deficit hyperactivity disorder (ADHD). Ex. 16E/15. Dr. Asher noted that [the] claimant's learning problems may well be explained by the combination of his attention problem and his somewhat below average intellectual abilities, and that the record does not conclusively show [the] claimant has any specific learning disabilities. Ex. 16E/25.

> Dr. Asher testified that, ignoring [the] claimant's pain experience, there was no reason [the] claimant could not do simple and repetitive work. Ex. 16E/30. Dr. Asher testified that it might take [the] claimant longer to reach production criterion levels or acceptable levels of production or pace, but that the less decision making and more straight forward and simple tasks, the more likely he would be able to maintain the pace. Ex. 16E/30. He further concluded

---

[1] Plaintiff also argues the ALJ rejected Dr. Rosengren's diagnosis of a pain disorder without adequate explanation. It is true that Dr. Rosengren diagnosed plaintiff with a pain disorder associated with both psychological factors and a general medical condition, but he did not assess plaintiff as having any limitations specifically related thereto or to plaintiff's complaints of pain in general. See AR 356-58. Accordingly, there was not error on the ALJ's part here.

ORDER - 7

[the] claimant could do detailed work if he were well practiced, without much independent decision making, at least not for a very long time. Ex. 16E/30. Dr. Asher assessed that because of [the] claimant's marked difficulties in concentration persistence and pace, it would be difficult for [the] claimant to work in an environment with distractions, including social distractions, a noisy workplace, or where people are talking. Ex. 16E/31. He assessed that a work task should be linear and simultaneous processing [sic], and that [the] claimant should have clear guidelines and maybe no opportunity for independent decision making when he is first learning the task.

The undersigned gives great weight to Dr. Asher's opinion overall, however, the undersigned accords little weight to his opinion regarding environmental limitations. As Dr. Asher testified, ADHD is a life-long impairment (Ex. 16E/25), and, despite [the] claimant's asserted attention deficit and reading and mathematics disorders, he successfully worked as a shipping-receiving clerk and stocker for many years (Ex. 2E/1) without the restrictions Dr. Asher testified would be necessary. Both of these prior occupations involve at least one of the environmental factors the medical expert sought to eliminate (i.e. noise and distracting activities). The record does not support a worsening of the claimant's mental status since he last worked, although there are varying reports of depression without any follow up regarding its affects on the claimant's functional capacity. The evidence supports the claimant's ability to pay attention, focus, and persist at an adequate pace to perform simple, repetitive tasks without public contact and limited contact with coworkers and supervisors. This is consistent with [the] claimant's mother's report and his own report from 2009 that he did well at his past job as a retail stocker. Ex. 44F/5. [The c]laimant reported that he worked well in the past in environments where he had only one supervisor, and was not required to be around large numbers of people. Ex. 44F/4. Moreover, the undersigned notes, ADHD generally improves with medication and the claimant has a history of not taking his medications. For example, in 2008 [the] claimant took Adderall reportedly for nine months to treat his ADHD, but in August 2009 he reported that he quit taking the medication on his own without consulting his prescribing provider. Ex. 27F. In 2008, an evaluator recommended [the] claimant take a mood stabilizing but stimulating antidepressant (Ex. 41F/23), however, the record does not show [the] claimant has taken any new psychotropic medication since he quit taking Adderall on his own initiative. Nevertheless, the undersigned notes the residual functional capacity limitations to no interaction with the general public and occasional superficial interaction with coworkers and supervisors will necessarily eliminate jobs that include any significant social distractions.

AR 485-87. Plaintiff argues the ALJ improperly rejected the environmental limitations assessed

ORDER - 8

by Dr. Asher here.  The Court disagrees.[2]  Specifically, plaintiff argues the record fails to support the ALJ's determination that he "successfully worked as a shipping-receiving clerk and stocker for many years" – both of which the ALJ observed, involved "at least one of the environmental factors [Dr. Asher] sought to eliminate (i.e. noise and distracting activities)" – "without the restrictions Dr. Asher testified would be necessary." AR 486.  But the record does show plaintiff has reported working for many years in these jobs. See AR 67, 75, 85.

Plaintiff asserts, however, that he stopped working at these jobs because of his medical issues.  But while plaintiff has reported and testified as such, most of the reasons he gave were due to his physical impairments or because of reasons not related to his alleged impairments, and not the environmental restrictions identified by Dr. Asher. See AR 74, 84-85, 224-25, 254-55, 316, 322, 325-26, 410-13, 440-41, 465-67, 605.  Indeed, in late December 2009, plaintiff told his vocational rehabilitation counselor that he had done "very well when he was stocking shelves in a retail environment.," and that he "would be interested in working in" such an environment. AR 666-67.  As such, the Court finds the ALJ did not err here.

Plaintiff also takes issue with the ALJ's statement that "[t]he record does not support a worsening of [his] mental status since he last worked." AR 486.  But again much of the evidence in the record plaintiff points to in support of this contention, concern his self-reports regarding his physical impairments and limitations, not the environmental limitations Dr. Asher assessed. See AR 109-14, 136-41, 439, 606.  As discussed below, furthermore, the prior ALJ's finding that plaintiff was not fully credible concerning his symptom testimony and subjective complaints

---

[2] Plaintiff also appears to argue, or at least imply, that the ALJ erred in failing to properly evaluate the testimony of Dr. Asher that work "should be linear," with "simultaneous processing." AR 454.  But plaintiff does not provide any further analysis as to why he believes the ALJ erred in this regard.  In addition, the Court finds these limitations are not inconsistent with a restriction to understanding, remembering and carrying out short simple instructions and with the ability to perform repetitive tasks as determined by the ALJ. See AR 480.

remains valid, such that the current ALJ was not required to fully credit plaintiff's testimony and self-reports, although, also as discussed below, he properly did not do so. Nor again as discussed below, does the additional objective medical opinion source evidence submitted subsequent to the prior ALJ's decision show a significant worsening in plaintiff's mental status.

C.    <u>Dr. Valeithian</u>

The record contains a mid-April 2007 letter written by Cherle M. Valeithian, Ph.D., in which she recommended that plaintiff be allowed certain accommodations in taking his massage therapy and bodywork certification examination. <u>See</u> AR 630. Specifically, Dr. Valeithian stated plaintiff should be given additional time to take the examination in a separate room, due to issues with "rapid processing of complex material" and with his ability "to read and quickly answer test items," and because of his need to minimize distractions in light of his "problems with sustained concentration." <u>Id.</u>

In late September 2008, Dr. Valeithian wrote another letter to "help explain the severity of [plaintiff's] response to his wife's suggestion of a separation," which she stated "should be taken into consideration in deciding appropriate circumstances for" his domestic violence charge. AR 629. Dr. Valeithian further stated in relevant part in that letter:

> Based on my knowledge of Mr. LeDoux's personality, from his therapy with me, it is my professional opinion that Mr. LeDoux is not, in general, a violent or abusive person, nor is he a danger to society. He is often quiet and unassuming, frequently compassionate, and has insight into how his past has affected him, and he appears to be making genuine effort into healing the traumas of his past. He appears genuinely disturbed about what he did to his wife, and is taking responsibility for that behavior.
>
> . . . [I]t appears to me that Mr. LeDoux's violence toward his wife was a result of both his PTSD, which was triggered by her discussion of a separation, and his ADHD, which interferes with cognitive processing, even under less stressful circumstances. . . .

<u>Id.</u>

ORDER - 10

Plaintiff argues the statements contained in these letters support a finding that his mental condition had worsened since he worked as a shipping-receiving clerk and stocker. But nothing in the above statements show plaintiff's symptoms have actually worsened, at least with respect to his ability to perform work-related activities. Rather, they merely provide some support for a determination that he may need accommodations with test taking, and an explanation for why he may have behaved the way he did in regard to the domestic violence incident. Indeed, nothing in the latter letter gives any indication plaintiff would have significant functional limitations in his ability to perform work-related activities.[3]

Although Dr. Valeithian did indicate in the first letter that plaintiff had issues with "rapid processing of complex material," and that he would need additional time in a separate room so as to allow him to "process information aloud as needed," she gave no opinion on whether plaintiff would have the same issues in an actual work setting, nor is it reasonable to imply from the letter that she meant to do so. See AR 630. This also is true in regard to the need to be separate from others in order to minimize distractions due to problems with sustained concentration. See id. In addition, to the extent such an implication is reasonable, the issues with processing complex material or the need to be separate from others to minimize distractions are adequately covered by the ALJ's finding that he is restricted to understanding, remembering and carrying out simple instructions and performing repetitive tasks, with no public contact and only occasional superficial interaction with coworkers and supervisors. See AR 480.

---

[3] Dr. Valeithian did also state that "ADHD interferes with the executive functions of the brain, such as maintaining cognitive control, acting from reason instead of emotion, and inhibiting impulses," and that plaintiff's "attempt to prevent his wife from calling 9-1-1 [during the incident] is evidence that, even though he was no longer dissociating, he was not yet completely in control of his behavior." AR 629. The first statement, however, is entirely general and thus is not specific to plaintiff. Nor does it relate to any actual work-related limitations. The second statement again merely provides an explanation for plaintiff's behavior at the time of the domestic violence incident, and thus is not particularly relevant to the issue at hand.

D.    Dr. Litman

A psychological evaluation report was completed in late October 2008, by Jack M. Litman, Ph.D., who diagnosed plaintiff with ADHD ("predominantly inattentive type"), a learning disorder ("with difficulties in reading, mathematics and written expression"), PTSD ("now chronic"), a mood disorder ("due to a history of [ADHD], learning disorders, and [PTSD], compounded by current criminal charges with depressive and anxiety related features"), and a personality disorder ("with dependent and avoidant features"). AR. 653. In addition, Dr. Litman assessed a GAF score of 45,[4] indicating "serious symptoms." Tr. 654.

At the same time, Dr. Litman completed a mental residual functional capacity assessment form, in which he checked boxes indicating that plaintiff was moderately to markedly limited in a number mental functional areas. See AR 659-60. On that form, Dr. Litman also stated that he believed that "with an appropriate and effective" medication, as well as "skillful psychotherapy," plaintiff "may be able to be successful in being gainfully employed," but that when he evaluated plaintiff (in late September 2008, and early October 2008), "he had experienced neither and was awaiting resolution of pending [criminal] charges." AR 636, 662. As such, Dr. Litman stated he "would not have found him to have the ability to be gainfully employed on a full time basis with any consistency when [he] completed [the] evaluation." AR 662.

With respect to Dr. Litman's report and findings, the ALJ found as follows:

. . . Dr. Litman is not qualified to provide a residual functional capacity [assessment] because that determination is made by the [Social Security

---

[4] A GAF score is "a subjective determination based on a scale of 100 to 1 of 'the [mental health] clinician's judgment of [a claimant's] overall level of functioning.'" Pisciotta v. Astrue, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007). It is "relevant evidence" of the claimant's ability to function mentally. England v. Astrue, 490 F.3d 1017, 1023, n.8 (8th Cir. 2007). "A GAF score of 41-50 indicates '[s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning,' such as an inability to keep a job." Pisciotta, 500 F.3d at 1076 n.1 (quoting Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) ("DSM-IV-TR") at 34); see also Cox v. Astrue, 495 F.3d 614, 620 n.5 (8th Cir. 2007) ("[A] GAF score in the forties may be associated with a serious impairment in occupational functioning.").

ORDER - 12

A]dministration.  However, the undersigned accords some, but not great
weight to Dr. Litman's opinion.  A preponderance of the evidence, including
Dr. Asher['s] and Dr. Rosengren['s] opinions, support finding [the] claimant's
mental impairments have not precluded him from all work activity.  However,
there is no reason to doubt that [the] claimant's symptoms would improve if
he received regular mental health therapy and were to be compliant in taking
the proper combination of psychotropic medications, as Dr. Litman opined.

AR. 488.  Plaintiff does not contest the ALJ's statement that Dr. Litman is not qualified to opine

as to the ultimate issue of employability, but argues the ALJ erred in not properly considering

Dr. Litman's diagnoses and limitations stemming therefrom, as indicated by the GAF score of

45.  In terms of diagnoses, the only additional argument plaintiff provides here is that the ALJ

"downplayed" Dr. Litman's diagnosis of PTSD. ECF #10, p. 12.  But it is not at all clear what

plaintiff means by "downplayed" or that the ALJ actually did so.  It is true that the ALJ did not

find plaintiff's PTSD to be a severe impairment (see AR 478), but again it is not at all clear what

significance, if any, this had on the ALJ's ultimate decision.  See Stout v. Commissioner, Social

Security Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (error harmless where it is non-prejudicial

to claimant or irrelevant to ALJ's ultimate disability conclusion).[5]

The Court also finds no error in the way the ALJ dealt with the GAF score of 45 assessed

---

[5] "The mere existence of an impairment is insufficient proof of a disability" Matthews v. Shalala, 10 F.3d 678, 680
(9th Cir. 1993).  That is, just because a claimant has been diagnosed with an impairment, such as PTSD, this does
not mean the claimant suffers from significant work-related limitations.  It is true, as just noted, that the ALJ in this
case found at step two of defendant's sequential evaluation process that plaintiff had a severe anxiety disorder, but
did not have a severe impairment consisting of PTSD.  See AR 478; 20 C.F.R. § 404.1520 (employing five-step
evaluation process to determine whether claimant is disabled; if claimant is found disabled or not disabled at any
particular step thereof, disability determination is made at that step and evaluation process ends; at step two of
thereof, ALJ must determine if impairment is "severe"; impairment is "not severe" if it does not "significantly limit"
claimant's ability to do basic work activities); 20 C.F.R. § 416.920 (same).  However, to the extent the ALJ did err
in not finding plaintiff's PTSD to be sever at step two, plaintiff still prevailed at that step, and the ALJ went on to
consider his PTSD diagnosis later in the disability evaluation process.  See AR 478, 487-88; Hubbard v. Astrue, 2010
WL 1041553 *1 (9th Cir. 2010) (because claimant prevailed at step two and ALJ considered claimant's impairments
later in sequential analysis, any error in omitting those impairments at step two was harmless) (citing Lewis, 498
F.3d at 911 (ALJ's error in failing to list bursitis at step two harmless, where ALJ's decision showed any limitations
posed thereby was considered later in sequential disability evaluation process); Burch v. Barnhart, 400 F.3d 676,
682 (9th Cir. 2005) (any error by ALJ in failing to consider plaintiff's obesity at step two harmless, because ALJ did
not err in evaluating plaintiff's impairments at later steps).

ORDER - 13

by Dr. Litman.  It is true that the ALJ did not expressly state he was rejecting that score, although he did mention it in his decision.  See AR 488.  As noted above, a GAF score of 45 indicates "'serious impairment in social, occupational, or school functioning,' *such as an inability to keep a job*." Pisciotta, 500 F.3d at 1076 n.1 (quoting DSM-IV-TR at 34) (emphasis added).  Thus, this GAF score is consistent with Dr. Litman's opinion that plaintiff would not be able to be gainfully employed.  Although a GAF score is more reflective of a claimant's actual functional level than Dr. Litman's stated opinion regarding general employability, the ALJ also noted that the weight of the medical evidence in the record – including the opinions of Drs. Rosengren and Asher – did not indicate plaintiff was precluded from all work. See AR 488; see also AR 601-08.

In addition, while a GAF score is "relevant evidence" of the claimant's ability to function mentally, and although it may be "of considerable help" to the ALJ, for example, in assessing a claimant's residual functional capacity, "it is not essential" to the accuracy thereof, an ALJ's "failure to reference the GAF score" in assessing a claimant's residual functional capacity "standing alone" does not make the RFC assessment inaccurate. England, 490 F.3d at 1023, n.8; Howard v. Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir. 2002).  In other words, the mere fact that a low GAF score – such as that found by Dr. Ltiman – may have been assessed by a medical source is not in itself sufficient to establish disability.

Accordingly, the ALJ did not err in rejecting those findings Dr. Litman made indicating an inability to remain gainfully employed as represented by the GAF score of 45. See Batson, 359 F.3d at 1195 (ALJ need not accept even treating physician's opinion that is inadequately supported by record); Thomas, 278 F.3d 957; Tonapetyan, 242 F.3d at 1149; Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996) (where opinion of examining physician is based on independent clinical findings, it is within ALJ's discretion to disregard conflicting opinion contained in

another examining physician's diagnosis). In addition, to the extent plaintiff is arguing the ALJ also erred in failing to adopt the mental functional limitations Dr. Litman checked on the mental residual functional capacity assessment form, the Court finds no such error.[6]

### E. Ms. Aman

Plaintiff's mental health counselor, Caryn L. Aman, M.A., wrote a letter to a state judge, in which she stated that she did not believe incarceration would benefit him, that he was "not a threat to society" or himself and that she was concerned that "jail time could actually aggravate his ADHD and PTSD symptoms." AR 631. In another letter she wrote in support of plaintiff's efforts to obtain state welfare benefits, Ms. Aman stated in relevant part:

> . . . At this point in time, Mr. LeDoux is very much unable to sustain any manner of employment until he is able to get back into therapy on a regular basis to reconvene efforts toward emotional, physical, spiritual, and psychological stability. Without financial support . . . Mr. LeDoux is likely to remain in this state of paralysis and, therefore, will remain unemployable.

AR 620.

---

[6] The Social Security Administration's Program Operations Manual System ("POMS") provides in relevant part:

> **NOTE:** The purpose of section I ("Summary Conclusion")[, in which Dr. Litman checked the mental functional areas in which he found plaintiff to be moderately to markedly limited,] . . . is chiefly to have a worksheet to ensure that the psychiatrist or psychologist has considered each of these pertinent mental [functional areas] and the claimant's . . . degree of limitation for sustaining [activities in those areas] over a normal workday and workweek on an ongoing, appropriate, and independent basis. **It is the narrative** written by the psychiatrist or psychologist in section III ("Functional Capacity Assessment")[, wherein Dr. Litman set forth his opinion that plaintiff would improve with proper treatment, but did not have the ability to be gainfully employed at the time of the evaluation] . . . **that adjudicators are to use as the assessment of RFC**. Adjudicators must take the RFC assessment **in section III** and decide what significance the elements discussed in this RFC assessment have in terms of the person's ability to meet the mental demands of past work or other work. This must be done carefully using the adjudicator's informed professional judgment.

POMS DI 25020.010(B)(1), https://secure.ssa.gov/apps10/poms.nsf/lnx/ 0425020010!opendocument (emphasis in original). Accordingly, the ALJ was required to look to the written statements Dr. Litman provided in Section III of the mental residual functional capacity form he completed, and not the specific areas of mental functional limitation contained in Section I thereof. It is true that the POMS "does not have the force of law." Warre v. Commissioner of Social Sec. Admin., 439 F.3d 1001, 1005 (9th Cir. 2006). Nevertheless, the Ninth Circuit has recognized it as being "persuasive authority." Id. Nor does the Court find or plaintiff provide any valid reasons for not following the above POMS directive in this case.

ORDER - 15

The ALJ stated he was gaving Ms. Aman's opinions "little weight," because "she failed to provide specific objective findings on which she based her assessment and relied substantially on [plaintiff's] self-report of his subjective symptoms." AR 488. The ALJ also found Ms. Aman was "not an acceptable medical source in accordance with the [Social Security] regulations." Id. Because Ms. Aman is not such a medical source, her opinions may be given less weight than those of acceptable medical sources. See Gomez v. Chater, 74 F.3d 967, 970-71 (9th Cir. 1996); 20 C.F.R. § 404.1513(a), (d), § 416.913(a), (d) (licensed physicians and licensed or certified psychologists are "acceptable medical sources"). An ALJ, however, may not reject the opinion of an "other medical source" such as Ms. Aman, solely because she is not an "acceptable medical source." See 20 C.F.R. § 404.1513(d) (evidence from "other sources," including other "medical sources," may be used to "show the severity" of claimant's impairments and their effect on his or her ability to work), § 416.913(d) (same); SSR 06-03p, 2006 WL 2329939 *3-*5 ("As set forth in regulations at 20 CFR 404.1527(b) and 416.927(b), we consider all relevant evidence in the case record when we make a determination or decision about whether the individual is disabled. Evidence includes, but is not limited to, opinion evidence from 'acceptable medical sources,' medical sources who are not 'acceptable medical sources,' and 'non-medical sources' who have seen the individual in their professional capacity.").[7]

---

[7] Indeed, in some circumstances it may be more appropriate to place greater weight on the opinion of one who is not a medical source:

> The fact that a medical opinion is from an "acceptable medical source" is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an "acceptable medical source" because . . . "acceptable medical sources" "are the most qualified health care professionals." However, depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.

It was proper, however, for the ALJ to reject Ms. Aman's opinions on the basis that they were based largely on plaintiff's own subjective complaints – with respect to which as discussed below, the prior ALJ's adverse credibility determination remains valid – rather than on "specific objective findings." AR 488; see Batson, 359 F.3d at 1195 (ALJ need not accept opinion of even treating physician if it is inadequately supported by clinical findings); Tonapetyan, 242 F.3d at 1149 (ALJ may disregard medical opinion based on claimant's complaints where record supports ALJ in discounting claimant's credibility); Morgan , 169 F.3d at 601.  Plaintiff argues Ms. Aman "based her opinions on her work with" him, "not merely on his self-report" (ECF #10, p. 15), but fails to point to any objective clinical findings resulting from such "work", nor does there appear to be any in the record.  Thus, here too, the ALJ did not err.

II.     The ALJ's Assessment of Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ. See Sample, 694 F.2d at 642.  The Court should not "second-guess" this credibility determination. Allen, 749 F.2d at 580. In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence. See id. at 579.  That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence. Tonapetyan, 242 F.3d at 1148.

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." Lester, 81 F.3d at 834 (citation omitted)].  The ALJ "must identify

Giving more weight to the opinion from a medical source who is not an "acceptable medical source" than to the opinion from a treating source does not conflict with the treating source rules in 20 CFR 404.1527(d)(2) and 416.927(d)(2) and SSR 96-2p, "Titles II and XVI: Giving Controlling Weight To Treating Source Medical Opinions."

SSR 06-03p, 2006 WL 2329939 *3-*5.

what testimony is not credible and what evidence undermines the claimant's complaints." Id.; see also Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834. The evidence as a whole must support a finding of malingering. See O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. See id.

In its prior order remanding this matter for further administrative proceedings, the Court found the ALJ properly discounted plaintiff's credibility on the basis that: (1) his testimony that nothing relieved his pain conflicted with other evidence to the contrary contained in the record; (2) he engaged in activities of daily living at a level not indicative of total disability; (3) he failed to seek serious, consistent treatment for the level of pain he was alleging; (4) his pain complaints were inconsistent with the objective medical evidence in the record; and (5) the record contained third party observations indicating plaintiff walked and moved in a manner that was inconsistent with his alleged debilitating pain and level of restrictions. See AR 536-43.

In again finding plaintiff to be not fully credible, the current ALJ cited the same first four reasons that the prior ALJ did. See AR 490-91. Other than his own additional self-reports and testimony, plaintiff largely fails to point to any new evidence in the record that shows those four reasons, or the prior ALJ's fifth reason noted above, are invalid. There is some evidence in the

record submitted after the prior ALJ's opinion that plaintiff had some financial difficulties in obtaining mental health counseling, and that he stopped taking two psychotropic medications due to adverse side effects. <u>See</u> AR 575, 605-06, 631, 663. But the record also shows that by late October 2009, plaintiff began receiving state assistance, which allowed him to reconvene mental health counseling sessions. <u>See</u> AR 575. There is other evidence in the record that plaintiff continues to be able to obtain medications through his primary care provider. <u>See</u> AR 664. Nor is there evidence that the two medications to which plaintiff had an adverse reaction, are the only medications he is able to take or to which he has access.

In addition, this does not take away from the lack of credibility the record shows plaintiff has shown in regard to the severity of his alleged disabling back pain and the kind and amount of treatment, or lack thereof, he sought therefor. In addition to the findings of the prior ALJ on this issue, the current ALJ noted:

> . . . In January 2008, [the] claimant reported having only occasional low back discomfort which had not changed in the past few months. Ex. 28F/1.

> The record subsequent to the second hearing shows [the] claimant has not received regular medical treatment or taken prescription pain medications for his back pain. He has never had back surgery and has had little treatment other than NSAID pain medication for the condition. . . .

AR 491. This adds further support to the adverse credibility determination the prior ALJ made.

The current ALJ also cited other evidence in the record submitted subsequent to the prior ALJ's decision that calls into question plaintiff's credibility. For example, he noted plaintiff's "subjective allegations" were "not consistent with his actual level of daily activities," including the following:

> . . . In January 2008, [the] claimant reported that he was working as a massage therapist, and he described himself as being a very regularly active person. Ex. 28F. In November 2009, [the] claimant reported that he was lifting a desk when he was moving, and re-aggravated his back pain. Ex. 30F/1. [The

ORDER - 19

c]laimant testified that he worked for his mother as a caretaker, paid through the State of Washington, from November 2007 until he was released from jail.

AR 490. Indeed, plaintiff reported in late December 2009, that he enjoyed helping his mother and did "well" assisting her, and, as noted above, that he believed he could perform a job where he had "only one supervisor, and was not required to be around large numbers of people," such as a retail stocker were he "did very well" in the past. AR 666-67.

The ALJ also discounted plaintiff's credibility for the following reason:

> Subsequent to the second hearing, [the] claimant was convicted of domestic violence assault against his ex-wife, which raises the serious issue of whether his primary obstacle to employment is finding employment in spite of his criminal conviction. [The c]laimant testified that he has attempted to work since 2007, and that currently he has had trouble because his applications are flagged because of his felony conviction. In August 2009 he reported that he lost his massage therapy license due to his conviction. Ex. 26F/2.

> Additionally, the record shows that [the] claimant's last employment as a care taker for his mother, paid through the State of Washington, ended not due to symptoms of his impairments, but due to his criminal conviction. He stated that after his felony conviction, he was no longer eligible to be the caretaker for his mother and this job ended.

AR 490-91. This too is a valid reason for discounting plaintiff's credibility. See Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998) (ALJ may consider motivation and issue of secondary gain in rejecting symptom testimony); Matney on Behalf of Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992).

III.     The ALJ's Evaluation of the Lay Witness Evidence in the Record

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001). In rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly

link his determination to those reasons," and substantial evidence supports the ALJ's decision. Id. at 512. The ALJ also may "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

A.    Ms. Kitagawa

The record contains a written statement from plaintiff's ex-wife, Nozomi Kitagawa, in which she sets forth her observations concerning plaintiff's symptoms and limitations, and which was improperly rejected by the prior ALJ. See AR 226-27, 543-44. In regard to that statement, the current ALJ found as follows:

> There is a lay witness statement from Nozomi Kitagawa, completed in June 2007 when she was still married and living with [the] claimant. Ex. 13F. Ms. Kitagawa stated that the claimant had debilitating pain and learning disabilities. I give her statement some weight with regard to her description of the claimant's difficulties when trying to perform more complex or detailed work and studies. However, because, at the time Ms. Kitagawa wrote her letter she had a close relationship with the claimant and lacked the expertise and possibly the motivation to offer an objective or functional assessment, her statements regarding the claimant's symptoms and limitations are considered with caution. It should be noted that her statement that nothing helped with [the] claimant's back pain is belied by the record that shows [the] claimant repeatedly reported exercise, stretching, his mother's Percocet, and a TENS unit help with his back pain. Ms. Kitagawa reported [the] claimant had never taken any medication for his ADHD, which is contradicted by the record that shows he was prescribed Adderall for nine months before he quit taking it on his own initiative. Additionally, her statements regarding [the] claimant's mental limitations conflict with the evidence that show [the] claimant was able to go to school full time, pass massage therapy licensing exams and work as a massage therapist until he lost his license due to a domestic violence conviction.

AR 489.

The Court agrees with plaintiff that the mere fact that Ms. Kitagawa had at the time she wrote her statement a close relationship with him, and that she "lacked the expertise" to offer an opinion of plaintiff's functioning as she observed it, are not valid reasons for rejecting all of her testimony. Family members who are in a position to observe a claimant's symptoms and daily

ORDER - 21

activities are deemed to be competent to testify as to those symptoms and activities. See Dodrill v. Shalala, 12 F.3d 915, 918-19 (9th Cir. 1993). It is true that in Sprague v. Bowen, 812 F.2d 1226 (9th Cir. 1987), the Ninth Circuit indicated that the existence of a "close relationship" between the lay witness and the claimant, and the potential to be "influenced" by the "desire to help," can be viewed as being "germane" to that particular lay witness. Id. at 1232 (citing 20 C.F.R. § 404.1513(e)(2)). Later, in Greger v. Barnhart, 464 F.3d 968 (9th Cir. 2006), the Court of Appeals again found the ALJ in that case properly considered the close relationship between the claimant and his girlfriend, and the possibility that she might have been influenced by the desire to help him. See id. at 972.

In Bruce v. Astrue, 557 F.3d 1113 (9th Cir. 2009), however, the Ninth Circuit reiterated its position that "friends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to [his or] her condition." Id. at 1116 (quoting Dodrill, at 1918-19. The Court of Appeals did note its prior decision in Gregor, but nevertheless went on to find the ALJ erred in rejecting the lay witness testimony in Bruce on the basis of that witness's close relationship with the claimant, without explaining this difference in its two rulings. See id. (citing 464 F.3d at 972).

The only explanation the Court can glean from reviewing those rulings is that in Greger there appears to have been at least some evidence – although the Ninth Circuit did not discuss exactly what that evidence was – of the lay witness "possibly" being "influenced by her desire to help" the claimant in addition to the "close relationship" she had with him (464 F.3d at 972) – while in Bruce, no such evidence existed. More recently, in Valentine v. Commissioner of Social Security, 574 F.3d 685 (9th Cir. 2009), the Court of Appeals stated that "evidence that a specific spouse exaggerated a claimant's symptoms *in order* to get access to his disability

ORDER - 22

benefits, as opposed to being an 'interested party' in the abstract, might suffice to reject that spouse's testimony." Id. at 694 (emphasis in original). Evidence of this type of exaggeration on Ms. Kitagawa's part, though, does not appear in the record.

The Court also agrees with plaintiff that it was improper for the ALJ to find the report of Ms. Kitagawa that plaintiff had never taken any medication for his ADHD was contradicted by evidence in the record that he was prescribed Adderral for nine months, because at the time Ms. Kitagawa wrote her statement Adderral had not yet been prescribed. See AR 468, 605. As such, Ms. Kitagawa cannot be discredited on this basis. On the other hand, the ALJ properly noted plaintiff's repeated reports that various treatment modalities had helped his back pain were not consistent with Ms. Kitagawa's statement that nothing helped it. Further, the ALJ did not err in finding that evidence of plaintiff's activities, including his ability to work as a massage therapist until he lost his license due to the domestic violence conviction, contradicted the observations of Ms. Kitagawa regarding his allegedly disabling mental limitations.

B.    Ms. Robertson

Plaintiff also takes issue with the following findings the ALJ made:

The record contains a letter from Monika Roberston, vocational rehabilitation counselor, dated September 2009. Ex. 33F. Ms. Robertson reported [the] claimant was currently not working "due to his instability," that [the] claimant was attempting to find work as a massage therapist, but that his license was under review due to his (domestic violence) legal history. Ex. 33F/1. She reported that without mental health counseling, medical management and housing assistance, she had concerns for his "stability." Ex. 33F/1. In December 2009, Ms. Robertson recommended [the] claimant receive services for job placement and training. Ex. 33F/1. The undersigned accords Ms. Robertson's opinion some weight, as her opinion that [the] claimant's "stability" would be improved with mental health counseling and medication is supported by the record. She did not apparently believe [the] claimant was incapable of all work activity as she recommended he receive services for job placement.

AR 488. Specifically, plaintiff states the ALJ claimed to accord Ms. Robertson's opinion only

ORDER - 23

some weight, implying that plaintiff believes the ALJ rejected it entirely, and did so improperly. The Court disagrees. What the ALJ rejected was Ms. Robertson's opinion that plaintiff was not working due to his "instability", when she herself recommended services for job placement and training, which the ALJ reasonably interpreted to mean she believed he was capable of engaging in at least some kind of work activity. This reason was germane to Ms. Robertson, constituting a proper basis upon which to reject that opinion. Nothing else in the testimony from Ms. Robinson contradicts the ALJ's own assessment of plaintiff's functioning. See AR 621, 663-68.

C.    Judge Emmal

Plaintiff argues as well that the ALJ erred in finding as follows:

> The undersigned notes that in May, 2009, an administrative judge[, Julie K. Emmal,] for the State of Washington's Department of Social and Health Services (DSHS) awarded [the] claimant general assistance-unemployable (GA-U) benefits. Ex. 7D. . . . However, the DSHS . . . and the Social Security Administration make determinations of disability based on a different set of laws and regulations. While the DSHS . . . determination[ is] considered, [it is] not binding. Rather, Social Security is required to render a decision based on an independent review of the record. In so doing, Social Security's decision may address issues and make findings contrary to the DSHS determination.

AR 482; see also A 566-69. Plaintiff argues the ALJ should have given Judge Emmal's opinion great weight, given the similarity between the two disability programs. But plaintiff presents no evidence or specific argument showing this to be the case. The Court, therefore, declines to give any credit to plaintiff's claim here. See Carmicle v. Commissioner of Social Sec. Admin., 533 F.3d 1155, 1161 n.2 (9th Cir. 2008) (issue not argued with specificity in briefing will not be addressed); Paladin Associates., Inc. v. Montana Power Co., 328 F.3d 1145, 1164 (9th Cir. 2003) (by failing to make argument in opening brief, objection to grant of summary judgment was waived); Kim v. Kang, 154 F.3d 996, 1000 (9th Cir.1998) (matters not specifically and distinctly argued in opening brief ordinarily will not be considered).

ORDER - 24

In addition, the Court notes Judge Emmal's decision itself reveals a clear difference in the standards used by DSHS and the Social Security Administration respectively. For example, Judge Emmal states that to be deemed "incapacitated" – and thus eligible for GA-U benefits – an applicant for such benefits must be found to be unable to "be gainfully employed as a result of a physical or mental impairment that is expected to continue for at least 90 days from the date" of application. AR 568 (quoting WAC 388-448-0001). However, in the Social Security context a claimant must establish that he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see also Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999). Nor is there any indication from Judge Emmal's decision that DSHS employs either the same or substantially similar standards for evaluating medical evidence, assessing credibility or determining a claimant's residual functional capacity or ability to perform his or her past work or other jobs existing in significant numbers in the national economy.[8]

IV.    The ALJ's Assessment of Plaintiff's Residual Functional Capacity

Defendant employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. If the claimant is found disabled or not disabled at any particular step thereof, the disability determination is made at that step, and the sequential evaluation process ends. See id. If a disability determination "cannot be

_____

[8] Plaintiff further asserts the ALJ should have given some weight to a letter written by a counselor with the DSHS Division of Vocational Rehabilitation, dated July 12, 2006, in which plaintiff was categorized as being "**Priority Category #1 – Individual with most severe disabilities**." AR 215 (emphasis in original). But this letter appears to have been made part of the record that was before the prior ALJ, and plaintiff did not challenge the ALJ's treatment of that letter, or failure to consider it, when the Court first dealt with this matter. Accordingly, it is not appropriate to deal with it now. In addition, as with the DSHS GA-U benefits program, there is no indication from this letter as to what "**Priority Category #1 – Individual with most severe disabilities**" means, or that the standards for making that determination are the same or substantially similar to those employed by the Social Security Administration. As such, here too the ALJ did not err.

made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 *2. A claimant's residual functional capacity ("RFC") assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. See id. It thus is what the claimant "can still do despite his or her limitations." Id.

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. See id. However, an inability to work must result from the claimant's "physical or mental impairment(s)." Id. Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id. In assessing a claimant's RFC, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

Here, the ALJ assessed plaintiff with the residual functional capacity:

> **. . . [T]o perform light work . . . specifically he: can lift and carry up to ten pounds frequently and twenty pounds occasionally; can stand and/or walk up to six hours out of an eight hour day; can sit up to six hours out of an eight hour day; can occasionally stoop, crouch, crawl, kneel, and climb ramps and stairs; should never climb ladders, ropes, or scaffolds; should avoid exposure to hazards such as unprotected heights and moving machinery; needs a sit/stand option or the ability to change position at will because of back pain; is able to understand, remember and carry out short simple instructions and perform repetitive tasks; should have no interaction with the general public, and occasional superficial interaction with coworkers and supervisors for work-related purposes.**

AR 480 (emphasis in original). Although plaintiff argues the ALJ omitted relevant functional limitations from this RFC assessment, he fails to specifically point out which ones were left out.

On the other hand, as noted above, the restriction to understanding, remembering and carrying out short simple instructions and performing repetitive tasks adopted by the ALJ does not – as the Court previously found – take into account the issues Dr. Rosengren found plaintiff had with respect to speed, accuracy, productivity, and quality. Accordingly, it is not entirely clear – also as the Court previously found – that the above residual functional capacity assessment accurately describes all of plaintiff's mental functional limitations.

V.     The ALJ's Findings at Step Five

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. See Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 404.1520(d), (e), § 416.920(d), (e). The ALJ can do this through the testimony of a vocational expert or by reference to defendant's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical posed by the ALJ. See Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984). The vocational expert's testimony therefore must be reliable in light of the medical evidence to qualify as substantial evidence. See Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988). The ALJ's description of the claimant's disability thus "must be accurate, detailed, and supported by the medical record." Id. (citations omitted). The ALJ, however, may omit from that description those limitations he or she finds do not exist. See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

At the most recent hearing, the ALJ posed a hypothetical question to the vocational

ORDER - 27

expert containing substantially the same limitations as were included in the ALJ's assessment of plaintiff's residual functional capacity. See AR 685-86. In response thereto, the vocational expert testified that an individual with those limitations – and with the same age, education and work background as plaintiff – would be capable of performing other jobs. See id. Based on the vocational expert's testimony, the ALJ found plaintiff to be capable of performing other jobs existing in significant numbers in the national economy. See AR 492-93.

Plaintiff argues, and the Court agrees, that because the ALJ failed to properly address the issues Dr. Rosengren found he had with speed, accuracy, productivity and quality, it is not entirely clear the hypothetical question the ALJ posed, as with the RFC he assessed, accurately describes all of plaintiff's mental functional limitations. The ALJ thus erred in relying on the vocational expert's testimony to find plaintiff not disabled. Because the ALJ did not err in his evaluation of the other evidence in the record as plaintiff argues, however, the Court declines to find any error on that basis at this step. For the same reason, the Court further finds the ALJ was not required to adopt the additional vocational expert testimony – that an individual who missed more than two days of work a month on a routine basis, could not maintain sustained competitive employment (see AR 687) – as the evidence does not support such a limitation.[9]

---

[9] In addition, the Court finds no merit in plaintiff's claim that he "seems particularly ill-suited" to the jobs that the vocational expert identified – which he asserts require fast-paced, detail-oriented work – given that the ALJ found he was markedly limited in concentration, persistence and pace. ECF #10, p. 21. It is true that the ALJ did make this finding at step three of the sequential disability evaluation process. See AR 479. As noted above, however, at steps four and five, the ALJ must assess the claimant's residual functional capacity and base his determinations at those steps on that assessment. On the other hand, the determination made at step three is separate and distinct from the residual functional capacity assessment employed at steps four and five. Indeed, SSR 96-8p, expressly provides in relevant part:

> . . . The psychiatric review technique described in . . . [20 C.F.R. §] 416.920a . . . requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in [four functional areas set forth in § 416.920a(c)(3), including concentration, persistence and pace, known also as the "paragraph B" criteria]. The adjudicator must remember that the limitations identified in the "paragraph B" . . . criteria are *not* an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential [disability] evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential

ORDER - 28

VI.    This Matter Should Be Remanded for Further Administrative Proceedings

The Court may remand this case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate." Id.

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002). Because issues still remain with respect to plaintiff's residual functional capacity and his ability to perform other jobs existing in significant numbers in the national economy at step five of the sequential disability evaluation process – in light of the ALJ's error in failing to properly account for the issues with speed, accuracy, productivity, and quality Dr. Rosengren found plaintiff had –

---

evaluation process *requires a more detailed assessment* by itemizing various functions contained in the broad categories found in [the "paragraph B" criteria].

1996 WL 374184 *4 (emphasis added).  As such, the ALJ was not required to include in his assessment of plaintiff's residual functional capacity a marked limitation in concentration, persistence or pace, merely because he found such a limitation existed in that area at step three.

this matter should be remanded for further administrative proceedings. Although the Court does acknowledge this is the second time this matter has been remanded due to an error the prior ALJ made as well, given the other evidence in the record (which, as discussed above, the current ALJ did not err in evaluating), it is not at all clear a finding of disability would be supported, even if Dr. Rosengren's opinion were to be fully credited.

CONCLUSION

Based on the foregoing discussion, the Court finds the ALJ improperly concluded plaintiff was not disabled, and therefore hereby reverses the ALJ's decision and remands this matter to defendant's for further administrative proceedings in accordance with the findings contained herein.

DATED this 18th day of October, 2011.


Karen L. Strombom
United States Magistrate Judge

ORDER - 30